UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NEVADA SELECT ROYALTY, INC.,<br><br>Plaintiff,<br>v.<br>JERRITT CANYON GOLD, LLC,<br>Defendant. | Case No. 3:22-cv-415-ART-CSD<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO STRIKE<br>(ECF Nos. 101, 102, 109). |

Plaintiff Nevada Select Royalty ("Nevada Select") sued Defendant Jerritt Canyon Gold, LLC, ("Jerritt Canyon") regarding royalties for a mercury-emissions system used at the Jerritt Canyon mine. The only remaining issue regarding liability is interpretation of a contract between Nevada Select and Jerritt Canyon.

## I. Factual Background

The parties are familiar with the factual and procedural background of the case. (*See* ECF No. 88 at 2–3.) Accordingly, the Court provides only the facts needed to understand the present motions.

### A. Parties and Dispute

Jerritt Canyon operates a gold mine. (ECF No. 101 at 3.) Nevada Select buys rights to royalties in gold mines. (ECF No. 101 at 4.)

Jerritt Canyon's predecessor-in-interest entered the Amended License Agreement ("License Agreement") with Nevada Select's predecessor-in-interest for the right to use a patented mercury-emissions-control system. (*See* ECF No. 105 at 4.) Jerritt Canyon (under a different name) acquired its rights as the Licensee under the License Agreement through a bankruptcy purchase in 2015, and Nevada Select purchased its assignment of rights as the Licensor in 2019. (*Id.*; ECF No. 24-1 at 9.) Jerritt Canyon consented to Nevada Select's assignment of rights in an Acknowledgement executed in 2019. (*Id.* at 17–21.)

1

Jerritt Canyon, as Licensee, made royalty payments to Nevada Select, as Licensor, under the License Agreement until December 2021. (ECF No. 102-8 at 3.) A few weeks after its last payment, Jerritt Canyon wrote Nevada Select's parent company that "it is terminating the Agreement and will no longer be making Royalty payments pursuant to Section 9 of the Acknowledgment nor making any other payment under any other term of the [Amended License] or the Acknowledgment." (ECF No. 102-13 at 2–3.)

Jerritt Canyon argues that the plain language of the License Agreement permitted it to stop paying royalties when it stopped using the patent. Jerritt Canyon stopped using the patent in January 2022. (ECF No. 101 at 10.) Jerritt Canyon also asserts that its mine closed in April 2023. (*Id.*)

Nevada Select argues that the plain language of the License Agreement requires Jerritt Canyon to pay royalties for the license until one of the termination conditions of the License Agreement is met. (ECF No. 102 at 14–15.) Nevada Select further argues that Jerritt Canyon did not pay royalties for November and December 2021, months when Jerritt Canyon seems to concede having used the mercury-emissions system. (*Id.* at 16; *see* ECF No. 101 at 5:8–10.) Nevada Select also argues, with citation to supplemental interrogatories from Jerritt Canyon, that the Jerritt Canyon mine was actively producing gold in April, May, and June 2024. (ECF No. 102 at 15; ECF No. 102-12 at 11.)

**B. The License Agreement**

The relevant language of the License Agreement follows:

> **2. License.** Licensor is the owner of certain inventions relating to the removal of mercury from gasses and/or liquids (the "Inventions"), as disclosed U.S. Patent No. 8,877,148 . . . . Licensor wishes to grant to Licensee, and Licensee wishes to receive, licenses under the Inventions and the Patent.
> . . . .
> Subject to the terms and conditions of this Agreement, including but not limited to the royalties payable under Section 3:

2

(a) Licensor grants to Licensee a perpetual license to the Patent for use at the Jerritt Canyon gold treatment plant in Nevada, USA (the "Facility") for a term ending on the earlier of expiration of the Patent or the life of the Jerritt Canyon Mine.
(b) Licensor grants to Licensee a perpetual license to the Inventions for use at the Facility for the life of the Jerritt Canyon Mine.
(c) The licenses granted in Sections 2(a) and 2(b) are referred to herin collectively as "the License".
(d) The License includes the right to exploit and use all present and future rights in connection with the Patents and Inventions, all associated confidential information, knowhow, show how, drawings, manuals, other technical documentation, and all improvements thereon or thereto, whether now existing or subsequently created.

3. **Royalties.** In consideration for the grant of the License, beginning on July 1, 2015 (from the Effective Date through June 30, 2015), and on the first day of each successive month thereafter, Licensee will pay to Licensor a per ton royalty on throughput by the Facility based on the Average Realized Gold Price ("ARGP"). AGRP is derived by dividing Total Gold Revenue during the previous month by Gold Ounces Sold during the previous month, both as recorded in the WBVG general ledger (Licensee historical account number 4020-20). . . .

. . . .

**5. Term.** Except as set forth in Section 2(a), the License will begin on the Effective Date and will continue for the life of the mine. . . .

**6. Exclusivity.** The Licensor will not directly or indirectly do any of the following during the Term:
(a) Conduct any of the activities permitted under the License, unless specifically authorized by, or in conjunction with, Licensee.
(b) Compete in any way with Licensee's business insofar as it relates in any way, directly or indirectly, to the use, commercialization or exploitation of the Inventions and the Patents; or
(c) License or otherwise permit or assist any other party to do any of the activities prohibited by this Section 6 at or in connection with the Facility.

. . . .

**10. Termination.** The License will terminate:
(a) At such time as the Parties mutually agree in writing; or
(b) At any time at the option of either Party, if the other Party materially defaults in the performance or observance of any of its obligations and fails to remedy the default within thirty (30) days after receiving a written demand to do so from the Party who is not in default.

. . . .

(ECF No. 24-1 at 11.)

The parties dispute the precise quantity of damages owed. (ECF No. 105 at 12–13; ECF No. 108 at 13.)

## II. Legal Standard

A party moving for summary judgment must show that there is no genuine issue as to any material fact in the claims for which it seeks summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court views the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Behrend v. San Francisco Zen Ctr., Inc.*, 108 F.4th 765, 768 (9th Cir. 2024). For cross-motions for summary judgment, the Court considers each party's evidence without considering which motion provided the evidence. *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## III. Analysis

First, the Court addresses the parties' competing interpretation of the plain language of the contract. It then addresses Jerritt Canyon's patent misuse argument, the parties' arguments for breach of the implied covenant of good faith and fair dealing, and damages.

### A. Contract Interpretation

Jerritt Canyon argues that the License Agreement unambiguously states that Jerritt Canyon only owes royalty payments while it is using the patent. Nevada Select argues that the license agreement unambiguously states that royalty payments are due whether or not the patent is being used.

"It has long been the policy in Nevada that absent some countervailing reason, contracts will be construed from the written language and enforced as written." *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 20 (Nev. 2001). "[C]onstruction of a contractual term is a question of law." *Sheehan & Sheehan v. Nelson Malley & Co.*, 117 P.3d 219, 223 (Nev. 2005). *The Power Co. v. Henry*, 321 P.3d 858, 863 (Nev. 2014) ("when a contract's language is unambiguous," a court "will construe

. . . it according to that language"). "Whether a contract is ambiguous likewise presents a question of law." *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013) (internal citation removed). A contract is ambiguous if its terms may reasonably be interpreted in more than one way. *Id.* (internal citations removed).

### 1. License and Royalty Clauses

By its terms, the Amended License states that royalty payments are due whether or not the patent is being used. *See State Dep't of Transportation v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 402 P.3d 677, 682 (Nev. 2017) (courts may not "interpolate in a contract what the contract does not contain"). The License Agreement states that the License "includes the right to exploit and use all present and future rights in connection with the Patents and Inventions," and that "[i]n consideration for the grant of the License . . . Licensee will pay to Licensor a per ton royalty on throughput by the Facility based on the Average Realized Gold Price ('ARGP')." (ECF No. 24-1 at 11.) The Licensee gets the right to use the patent and associated inventions in exchange for a percentage of ARGP. The contract states that royalties are "consideration for the grant of the License," not use of the license.

Jerritt Canyon argues that it did not receive non-patent assets or technology besides the '148 patent, and that "[i]t follows that once Jerritt started using a different process than that covered by the '148 Patent, it was not obligated to continue making royalty payments." (ECF No. 101 at 12.) The contract entitled Jerritt to "the right to exploit and use all present and future rights in connection with the [patent] . . . and all improvements thereon or thereto, whether now existing or subsequently created." (ECF No. 24-1 at 11.) The fact that there were no additional inventions or subsequently created improvements does not allow Jerritt to change the terms of the contract after the fact. *See Kaldi*, 21 P.3d at 20 (courts enforce contracts as written).

5

### 2. Exclusivity Provision

Nevada Select argues that the License Agreement's exclusivity section supports its reading of the contract because it provides benefits to the Licensee separate from use of the patent. (ECF No. 106 at 13–14.) Jerritt Canyon responds that the license agreement is not an "exclusive contract" under patent law. (ECF No. 101 at 12; ECF No. 105 at 9–10.)

Whether a License Agreement is an exclusive license under patent law is a question relevant to a party's standing to make infringement claims under the patent. *See Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A., Inc.*, 19 F.4th 1315, 1320 (Fed. Cir. 2021); *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998).

The contract states, under the heading "Exclusivity," that the Licensor will not "[c]ompete in any way with Licensee's business insofar as it relates in any way, directly or indirectly, to the use, commercialization or exploitation of the Inventions and the Patents." (ECF No. 24-1 at 11.) The Amended License provides some degree of exclusivity. Whether this term constitutes an exclusive license under patent law is not relevant to the issue at hand: whether the License Agreement requires Jerritt Canyon to make payments for periods when it does not use the patent.

Jerritt Canyon also argues that the exclusivity provision did not actually exclude competitors by pointing to deposition testimony from a predecessor-in-interest who stated that he did not believe he was violating this provision by advertising the license to other companies. (ECF No. 101 at 14.) The Court does not consider parol evidence when the written language of the contract is unambiguous. *See MMAWC, LLC v. Zion Wood Obi Wan Trust*, 448 P.3d 568, 572 (Nev. 2019).

### 3. Use of "Perpetual"

Jerritt Canyon next argues that Nevada Select's reading of the contract

1  impermissibly relies on the word "perpetual." (ECF No. 101 at 15.) The License
2  Agreement states that it requires payment of royalties for the "life of the Jerritt
3  Canyon Mine."[1] (*See* ECF No. 106 at 17.) Taking out the word "perpetual" does
4  not affect the Court's reading of the term of the contract.

### 4. Parol Evidence

The parties raise additional arguments predicated on the original patent-holder's deposition testimony. (*See, e.g.*, ECF No. 101 at 13; ECF No. 105 at 9; ECF No. 106 at 19.) In Nevada, contracting parties' intent is discerned from the four corners of the contract. *See MMAWC, LLC*, 448 P.3d at 572. It is not necessary or appropriate for the Court to consider evidence from outside the contract when the contract's language is unambiguous, and the Court accordingly denies these arguments.

### B. Patent Misuse

Jerritt Canyon next argues that the License Agreement is an impermissible "total sales" patent license.

A licensor of a patent may not use its monopoly "to garner as royalties a percentage share of the licensee's receipts from sales of other products" or otherwise "derive a benefit not attributable to use of the patent's teachings." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 136 (1969). "Conditioning" occurs when the licensor of a patent "refuses to license on any other basis" besides royalties on products that do not use the patent, and it is a form of patent misuse. *Id.* at 135. Jerritt Canyon argues that a total sales patent license is only acceptable when "convenience of the parties, rather than patent power," requires it. (ECF No. 105 at 8.) Nevada Select responds that *Zenith Radio* states that absent a finding of conditioning, a total-sales royalty is permissible.

---

[1] Jerritt Canyon states that the Amended License does not require payment of royalties after expiration of the patent. (ECF No. 101 at 18.) As the patent does not expire until 2032, there is no reason to address this issue.

7

(ECF No. 108 at 7.) Nevada Select's position is correct. *See Zenith Radio*, 395 U.S. at 135.

A party alleging patent misuse bears the burden of showing conditioning. *See id.* Jerritt Canyon points to a district court case that found conditioning in the licensor's "firm policy of refusing to grant licenses unless such licenses contained a provision requiring royalties to be paid on the total sales of [items] not covered by the . . . patent." *Glen Mfg. Inc. v. Perfect Fit Indus., Inc.*, 324 F. Supp. 1133, 1137 (S.D.N.Y. 1971). Nevada Select argues that Jerritt Canyon has shown no evidence of conditioning in the formation of the License Agreement at issue. (ECF No. 108 at 9.) Jerritt Canyon does not point to anything in the record showing otherwise. (*See* ECF Nos. 101, 105, 107.) The Court accordingly denies this argument.

### C. Other Arguments

Jerritt Canyon also argues that its settlement agreement with Nevada Select's predecessor-in-interest in 2023 extinguished Nevada Select's claims under the contract. (ECF No. 101 at 27–28.) At the time of that settlement, the predecessor-in-interest had already assigned its rights to royalties to Nevada Select. (ECF No. 102 at 8; ECF No. 24-1 at 3.) Jerritt Canyon's settlement with the predecessor-in-interest does not affect claims based on the rights the predecessor-in-interest had already sold.

Jerritt Canyon also mentions that it received no legal consideration when it executed its Acknowledgement of Nevada Select's predecessor-in-interest's assignment of rights. (ECF No. 105 at 10.) It then suggests that the acknowledgment was a "unilateral obligation," but does not go so far as to argue that the assignment to Nevada Select was invalid. (*Id.*) Nor does it cite any legal authority in this section. (*See id.*) The Court declines to consider this argument.

Both parties argue that the other's predecessor-in-interest drafted the license agreements, and, as such, that ambiguities must be interpreted against

the drafter. (*See* ECF No. 101 at 17; ECF No. 106 at 19.) As mentioned above, *see supra* III.A, the Court does not find the contract ambiguous and accordingly declines to address these arguments.

### D. Breach of the Covenant of Good Faith and Fair Dealing

Both parties seek summary judgment on Nevada Select's claim of breach of the covenant of good faith and fair dealing. While "[a]ll contracts impose upon the parties an implied covenant of good faith and fair dealing," *Nelson v. Heer*, 163 P.3d 420, 427 (Nev. 2007), "[i]t is well established that a claim alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim." *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1252 (D. Nev. 2016), *amended in part*, No. 3:13-CV-0445-LRH-VPC, 2016 WL 11722898 (D. Nev. Nov. 1, 2016) (citing *Daly v. United Healthcare Ins. Co.*, 2010 WL 4510911, at *2 (N.D. Cal. 2010)); *see also Guz v. Bechtel Nat. Inc.*, 8 P.3d 1089 (Cal. 2010). Nevada Select's claim on the implied covenant is based on the same conduct as its breach claim. (*See* ECF No. 1-1 at 8–9.) Since the Court has found summary judgment appropriate on Nevada Select's claim of express breach of contract, the implied covenant claim is dismissed with prejudice.

### E. Damages

The parties dispute the precise quantity of damages due. Nevada Select argues for its original position of $384,448.80 in damages. (ECF No. 108 at 14–15.) Jerritt Canyon points to discrepancies in accounting and calculations in the amount Nevada Select has requested. (ECF No. 105 at 13.) It further requests that it be given the chance to work with Nevada Select toward a stipulated damage amount. (*Id.*) The Court grants Jerritt Canyon's request and orders the parties to meet and confer as described in the conclusion of this order.

### IV. Motion to Strike (ECF No. 109)

Nevada Select seeks to strike exhibits in Jerritt Canyon's reply in support

of its motion for summary judgment (ECF No. 107). (ECF No. 109.) Granting Nevada Select summary judgment on liability has mooted this motion, and the Court accordingly denies it.

**V.     Conclusion**

The Court grants summary judgment on liability to Nevada Select (ECF No. 102).

The Court denies Nevada Select's Motion to Strike as moot. (ECF No. 109.)

The Court orders the parties to meet, confer, and file a status report within 21 days of this order to determine the precise quantity of damages due. (*See* ECF No. 105 at 13–14.) Should the parties fail to reach a consensus, the parties may submit supplemental briefs on damages not to exceed five pages, excluding exhibits, with no responses, by July 18, 2025.

Dated this 20th day of June, 2025.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE